AO 106 (Rev. 06/09)   Application for a Search Warrant

# UNITED STATES DISTRICT COURT
for the
Eastern District of Missouri

|  |  |
|---|---|
| **In the Matter of the Search of**<br>A DELL PERSONAL COMPUTER (PC) (MODEL: DCNE / SERIAL: 94FSJ25 [CONTAINING A SEAGATE HARD DRIVE; MODEL: ST500DM002; SERIAL: Z3TS1DMP] currently in possession of the St. Charles County Police Department – Evidence Division located at 101 Sheriff Dierker Court, O'Fallon, MO 63366 | )<br>)<br>)<br>) |

No. 4:23 MJ 2081 JSD

**FILED UNDER SEAL**

SIGNED AND SUBMITTED TO THE COURT FOR FILING BY RELIABLE ELECTRONIC MEANS

## APPLICATION FOR A SEARCH WARRANT

I,   Mark Leone   , a federal law enforcement officer or an attorney for the government request a search warrant and state under penalty of perjury that I have reason to believe that on the following property:

**See Attachment A**

located in the   Eastern   District of   Missouri  , there is now concealed

**See Attachment B**

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

      xx   evidence of a crime;
      xx   contraband, fruits of crime, or other items illegally possessed;
      xx   property designed for use, intended for use, or used in committing a crime;
            a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| Title    Section<br>18 U.S.C. § 249 | Hate Crimes |

The application is based on these facts:

      SEE ATTACHED AFFIDAVIT WHICH IS INCORPORATED HEREIN BY REFERENCE.

      ✓     Continued on the attached sheet.
      ❑     Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

I state under the penalty of perjury that the following is true and correct.

_____
*Applicant's signature*
Mark Leone, TFO, FBI
*Printed name and title*

Sworn to, attested to, and affirmed before me via reliable electronic means pursuant to Federal Rules of Criminal Procedure 4.1 and 41.

Date:   July 19, 2023

_____
*Judge's signature*

City and State:   St. Louis, Missouri

Honorable Joseph S. Dueker, U.S. Magistrate Judge
*Printed name and title*
AUSA:  Matthew Drake

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI

IN THE MATTER OF THE SEARCH OF IN THE MATTER OF THE SEARCH OF:
A DELL PERSONAL COMPUTER (PC) (MODEL: DCNE / SERIAL: 94FSJ25 [CONTAINING A SEAGATE HARD DRIVE; MODEL: ST500DM002; SERIAL: Z3TS1DMP] currently in possession of the St. Charles County Police Department – Evidence Division located at 101 Sheriff Dierker Court, O'Fallon, MO 63366

)
)
)
)
)
)

No. 4:23 MJ 2081 JSD

**FILED UNDER SEAL**

SIGNED AND SUBMITTED TO THE COURT FOR FILING BY RELIABLE ELECTRONIC MEANS

## AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A SEARCH WARRANT

I, **MARK LEONE**, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property, digital storage media, described in Attachment A, which is currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

2.      I am a Task Force Officer ("TFO") with the Federal Bureau of Investigation ("FBI") in the St. Louis Field Office and have been since February 2019. I have been a police officer for 21 years, with 17 years of investigative experience as a detective. I am currently assigned to the Joint Terrorism Task Force (JTTF), which specifically investigates counterterrorism and other violent crime matters. Through my training, knowledge, and experience as a Police Officer and Task Force Officer, I am familiar with investigations involving individuals who use electronic means to research, plan, communicate, coordinate, and carry out acts of violence. Such investigations include executing search warrants on computers,

email accounts, telecommunication flash drives, and other forms of electronic media to include

the investigation of violations of Title 18 of the United States Code and related offenses.

3.     The facts in this affidavit come from my personal observations, my training and

experience, and information obtained from other agents and witnesses. I have been working on

the investigation as part of an investigative team.  This affidavit is intended to show merely that

there is sufficient probable cause for the requested warrant and does not set forth all of my

knowledge about this matter.

4.     Based on my training and experience and the facts as set forth in this affidavit,

there is probable cause to believe that violations of 18 U.S.C. §249 have been committed by

Christopher Dufrenne or other persons known and unknown.  There is also probable cause to

search the information described in Attachment A for evidence of these crimes and contraband or

fruits of these crimes, as described in Attachment B.

### LOCATION TO BE SEARCHED

5.     The property to be searched is a Dell Personal Computer (PC) (Model: DCNE /

Serial: 94FSJ25 [containing a Seagate hard drive; Model: ST500DM002; Serial: Z3TS1DMP]

(hereinafter "the **DEVICE**").  The **DEVICE** is currently possession of the St. Charles County

Police Department – Evidence Division located at 101 Sheriff Dierker Court O'Fallon, MO

63366.

6.     The applied-for warrant would authorize the forensic examination of the

**DEVICE** for the purpose of identifying electronically stored data particularly described in

Attachment B.

**TECHNICAL TERMS**

7.      Based on my training and experience, I use the following technical terms to convey the following meanings:

a. Storage medium: A storage medium is any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

b. Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

8.      In my training and experience, examining data stored on flash drives and electronic media such as the DEVICE of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the Flash drive or DEVICE.

**THE INVESTIGATION**

9.      On or about November 28, 2022, authorities from the New Zealand Department of Corrections alerted the Federal Bureau of Investigation, by way of the New York Police Department and the St. Louis Fusion Center about a typed letter that was received by the Department of Corrections in Wellington, New Zealand. This facility houses convicted mass-

murderer Brenton Tarrant.  The handwritten envelope was postmarked November 7, 2022, from St. Louis, Missouri and had a return address to Chris Dufrenne ("Dufrenne") of 313 Trails of Sunbrook, St. Charles, MO 63301.  The enclosed letter was address to Brenton Tarrant, with the greeting *"To Brenton Harrison Tarrant"* and signed *"Your teammate always, Chris."*  In a later contact, Dufrenne admitted to me that he sent this letter, described in more detail in Paragraph 11.

10.     By way of background, the following facts are known to me and/or the investigative team through personal investigation, law enforcement reports, and reliable media sources:

a.     On March 15, 2019, two consecutive mass shootings occurred in a terrorist attack on mosques in Christchurch, New Zealand. The attacks were carried out by a lone gunman who entered both mosques during Friday prayer. He began at the Al Noor Mosque in Riccarton, New Zealand at about 1:40 pm and continued at the nearby Linwood Islamic Centre at about 1:52 pm. In the two shootings, 51 people were killed and 40 others were injured.

b.     The gunman, 28-year-old Brenton Harrison Tarrant ("Tarrant") from Grafton, New South Wales, Australia, was arrested after his vehicle was rammed by a police unit as he was driving to a third mosque in Ashburton, New Zealand. Tarrant was described in media reports as a white supremacist. Tarrant live-streamed the first shooting on Facebook and, prior to the attack, had published a manifesto which was available on the Internet. Both the video and manifesto were subsequently banned in New Zealand and Australia, but they can be accessed via the Internet in the United States. On March 26, 2020, Tarrant pleaded guilty to 51 murders, 40 attempted murders, and engaging in a terrorist act. He was sentenced in August 2020 to life imprisonment without the possibility of parole, the first such sentence in New Zealand.

c.      A review of Tarrant's 87-page manifesto, titled "The Great Replacement,"

reveals his motivations for carrying out the attacks.

i.      In summary, Tarrant described himself as a racist, white-

nationalist, and fascist who opposes the immigration of non-whites to Western countries, to

include the United States. He describes Muslims specifically as "Invaders" who are destroying

the white race and its culture.  Tarrant sought the removal of non-Europeans from these lands, by

any means necessary, including force and violence.

ii.      Tarrant explained that he considered many methods with

which to commit his attacks, but ultimately chose firearms for the affect [sic] it would have on

social discourse, the extra media coverage it would provide, and the affect [sic] it could have on

the politics of the United States and thereby the political situation of the world.  Hoping to create

enough political pressure in the United States that the "left" would ban the second amendment,

provoking the "right," and dividing the United States along racial and political lines, ultimately

resulting in a civil war.

iii.      Tarrant continued, stating his attack was driven by anti-

immigration, anti-ethnic replacement, and anti-cultural replacement, explaining he felt no

remorse for his actions, and only wished he could have killed more "*Invaders*."  He viewed his

attack as an appropriate response to an occupying force, and himself as a lawful uniformed

combatant.

d.    Tarrant also discussed himself in his manifesto, stating "I will be forgotten

quickly. Which I don't mind. After all I am a private and mostly introverted person." These are

characteristics he has in common with Dufrenne.

5

e.    Tarrant stated that "an attack was planned roughly 2 years in advance. Christchurch attack 3 months in advance…The best time to attack was yesterday, the next best time is today."

i.    In the timeline of relevant events, Dufrenne and Tarrant played video games (per Dufrenne) in approximately 2010. Tarrant's murders were committed in 2019 and he pleaded guilty in 2020.

ii.    Tarrant also acknowledged in the manifesto that he was taught violence and extremism by video games.

11.    In Dufrenne's letter to Tarrant, he showed support for Tarrant and approval for his actions, stating:

a.    "You kicked ass out there! New Zealand should be thanking you for dispatching those would-be bombers.  I've read your manifesto several times.  It's really good. You really fleshed out our philosophy... I support you… That video was really something man. Right from the heart. I'll carry on the fight for our people." This statement indicates to me that it is an intent to commit violence similar to Tarrant's as any intent to "carry on" Tarrant's fight would be the killing of "invaders."

b.    Dufrenne also asked Tarrant to write him back and describe what it felt like to kill. This express request to know what it felt like to kill over 50 people adds to the concerns expressed above.

c.    In the same letter, Dufrenne wrote, he reminded Tarrant of a First Person Shooter (FPS) video game, "Brutal Doom," that they played together previously.  Dufrenne recalled that he created a "phs" data file of his school.  Later in the letter, Dufrenne stated "I also set the British grenadiers fife and drum to be the music for phs, perfect pick (although I think

6

that song will be stuck in my head until the day I die).  Just imagine our rockets and bullets streaming into that gym and blowing everything to hell haha."

        d.    As previously stated, Tarrant live-streamed a portion of his attack.  The video begins with Tarrant listening to music as he drove to his first target, the Al Noor mosque, where he initiated his attack.  On this video, the last song Tarrant is heard listening to prior to the attack, is the British grenadier's fife and drum, the same song Defrenne set as the music for his phs.

        e.    Dufrenne went on to congratulate Tarrant in the lethality of his attack, writing "You got third in the international shooter scoreboard, mate!"

12.    Preliminary investigation revealed Dufrenne was recently named as a suspect in an unlawful use of weapon (UUW) offense in St. Charles City PD (Report # 22-9567). On November 5, 2022, Dufrenne was reported as behaving oddly and as having made threatening movements with a dagger towards a woman as she left the Trails of Sunbrook apartment complex. This apartment complex is located within St. Charles, Missouri and both Dufrenne and the woman live in the complex. The victim reported that she was driving out of the complex, when a man, authorities believed to be Dufrenne, began reversing from a parking space in her path. Both vehicles stopped and no collision occurred. The victim proceeded on her way to the exit, all the while Dufrenne was tailgating her and repeatedly honking his horn. As the victim neared a stop sign, she stopped her vehicle and lowered her car window. She asked Dufrenne if he needed something. The victim reported the man, driving the vehicle later determined to be registered to Dufrenne, got out of his car and approached her vehicle. He had a large dagger unsheathed and in his hand at his side. When the victim saw the dagger, she closed her window and quickly drove off, fearing for her safety. She later experienced a panic attack because of the

encounter, though she did not report it immediately to the police but did after a second concerning incident six days later. On November 11, she saw Dufrenne outside of her apartment building and he appeared to be taking photographs of her vehicle, apartment, or both. Victim lives in the rear of the apartment complex and Dufrenne lives very close to the entrance/exit. Despite finally reporting Dufrenne's actions to law enforcement, she feared Dufrenne would retaliate against her for seeking prosecution and she ultimately decided not to press charges. It should be noted that while Dufrenne and the victim reside within the same complex, they do not live in the same building. In order to get to be where Dufrenne was when he appeared to be taking photographs, he would have had to travel off the main drive through the complex and into a parking lot which provides access to the victim's apartment building, which is furthest from the main drive. This indicates it was not a coincidence that he located her car and/or her residence.

13.     On November 29, 2022, I and FBI Special Agent Trevor Welter (SA Welter) interviewed Kelly Joseph, the Leasing Manager of Trails of Sunbrook Apartment Complex. Joseph advised the complex management has recently received multiple complaints about tenant Dufrenne and his unusual behavior. These reports include the aforementioned incident with the dagger, Dufrenne allegedly egging a neighbor's door, and reports of Dufrenne knocking on female tenants' doors and when they answer, just staring at them and not speaking.

14.     On November 29, 2022, SA Welter and I attempted to interview Dufrenne at his apartment. After knocking on his door twice, with a reasonable time in between knocking, we heard the sound of a shotgun being cycled inside the apartment door. I know this based on my training and experience with firearms. Dufrenne did not open the door.

15.     On November 29, 2022, St. Charles County Detective Geoff Presson and I interviewed Larry and Patricia Dufrenne ("Larry" and "Patricia"). They are the parents of

Dufrenne.  Larry described Dufrenne as a "troubled young man, a loner who has no friends nor romantic interests, is unemployed and spends a great deal of his time playing computer games in his residence."  Dufrenne is an introvert, just as Tarrant described himself.

16.     Larry and Patricia confirmed Dufrenne was in possession of a pump-action shotgun. They also told members of the investigative team that Dufrenne previously suffered from addictions to alcohol, marijuana, heroin and methamphetamine.  Larry and Patricia denied that Dufrenne previously underwent mental health evaluations and that he was prone to violence.

    a.     Subsequent investigation revealed Larry and Patricia called the St. Charles County Police Department to their home on November 22, 2017 and reported that Dufrenne attacked Larry and held a knife against his father's throat.

    b.     Larry and Patricia completed affidavits against Dufrenne and he was taken for a mental health evaluation at a local hospital by police.

    c.     Dufrenne was arrested for Domestic Assault 1st Degree and Armed Criminal Action. The St. Charles County Prosecuting Attorney's Office charged Dufrenne with Unlawful Use of a Weapon-Exhibiting on January 17, 2018 in cause number 1811-CR00219.

    d.     That case was ultimately dismissed on November 28, 2018 when Larry and Patricia did not appear at the preliminary hearing.

17.     On November 30, 2022, SA Welter and I interviewed Dufrenne's ex-girlfriend ("XGF"). We also interviewed a former roommate ("XRM") of Dufrenne and XGF. Both expressed concerns about their safety for talking with us. The XGF has known Dufrenne for approximately four years, living together for approximately two years, but has not seen or had contact with him for over a year. They broke up in approximately March 2021, but she remembers the last contact with him was in June or July 2021 when he sent her "obsessive"

messages, calling her a goddess and saying he couldn't live without her. She then blocked his number, to prevent future contact. Both XGF and XRM described Dufrenne as "psycho" and "delusional." Dufrenne previously accused XRM of being an operative for the Central Intelligence Agency or FBI and that he was sent to spy on Dufrenne. (To my knowledge, there have been no prior investigations of him by either agency.)   Additionally, Dufrenne had expressed his belief to him that we as a society all live in a simulation. Both XGF and XRM were advised the FBI had received allegations that Dufrenne had expressed either a desire to and/or approval of committing an act of violence.   XGF was asked whether, if she was the investigator in this matter, she would dismiss this as a harmless obsession or if she would be concerned.  XGF stated she would be "very concerned," adding that authorities need to take this "very seriously." She stated it was her opinion that if Dufrenne is researching things of this nature, he is likely "considering doing something."  XGF added that Dufrenne has concerned her so much over the years that she occasionally checks the news when a violent incident happens to see if Dufrenne was involved.

18.     Based on my training, knowledge, and experience, the characteristics of Dufrenne as described by his parents, former girlfriend, and former roommate are consistent with those of people known to law enforcement to have committed or attempted to commit mass casualty shootings. This includes, for example, the characteristics of Orlando Harris, who recently killed two people and shot many others at St. Louis' Central Visual and Performing Arts High School.

19.     On December 2, 2022, I swore out a mental health warrant concerning Dufrenne, based on the information known at the time. The warrant was issued by the Honorable Anthony Linson (per case # 2211-MH00914).

20.     On December 2, 2022, Dufrenne was detained on the mental health warrant while leaving his apartment. At the time he was taken into custody, Dufrenne was in possession of a large dagger, with an approximate blade length of 7," holstered in a sheath on his right hip. This dagger is believed to be the same weapon used to threaten the female tenant on November 5, 2022. Dufrenne gave verbal consent to unlock his apartment and place the dagger inside after he was told the hospital would not allow weapons. When his apartment door was opened, I observed a black pump-action shotgun situated on a chair, opposite the front door in the front room. When asked, Dufrenne admitted to cycling the shotgun during the time SA Welter and I were at his door, however he denied that he intended it to be a threat. When asked for consent to search his apartment and vehicle, Dufrenne declined.

21.     During this interview, Dufrenne was wearing a necklace displaying a pendant which he described as a Slavic warrior's symbol known as a "Kolovrat." He was wearing the pendant on the outside of his shirt.   Upon researching this symbol on the website "ReportingRadicalism.org," I learned that the Kolovrat is identified as a "sun shaped swastika with eight arms."  The site goes on to state the Kolovrat is used as a hate symbol by "Far-right groups in a number of Slavic countries, mainly Russia and Ukraine, and they use the Kolovrat in place of a swastika."

22.     Dufrenne was transported by a St. Charles County Sheriff's Deputy to Mercy Hospital pursuant to the mental health warrant.

23.     After Dufrenne was taken to Mercy Hospital, I again spoke with Larry who told me that he was on his way to Dufrenne's apartment to search for and remove any firearms or large knives that have no daily household purpose.

11

24.     On Tuesday, December 6, 2022, I obtained and executed a Missouri state search warrant for Dufrenne's apartment located at 313 Trails of Sunbrook, St. Charles, MO 63301.  Of note, there was not a printer in his apartment. This suggests to me that Dufrenne's letter to Tarrant was likely stored on a digital media storage to include the DEVICE and taken to be printed elsewhere.

25.     On Wednesday, December 7, 2022, I learned that Dufrenne had been transferred from Mercy to Hyland Behavioral Health Center and that the Flash drive was among Dufrenne's property at the health center. This Flash drive would have been in Dufrenne's possession when he was detained on the mental health warrant. At the time I and other members of the team believed the Flash drive potentially contained evidence related to possible hate crimes or other offenses.

26.     When Dufrenne was initially checked in at Mercy Hospital to await a bed at Hyland, he gave several items to his parents to take and secure. Those items included his wallet, cell phone, headphones, keys, court documents, the knife sheath that held the dagger, and items of clothing.

27.     Despite not having a computer with him at the hospital or any use for the Flash drive, Dufrenne did not give the Flash drive to his parents to secure.  He further inquired of the staff about its whereabouts when moved from Mercy to Hyland. This suggested that there were items of importance to Dufrenne and/or things he did not want his parents (who are supporting him in all areas of his life) to see what was contained on the Flash drive. It also suggested that the letter he mailed to Tarrant in addition to similar or related documents were on the Flash drive.

28.     The Flash drive is currently in the lawful possession of the Federal Bureau of Investigation (hereinafter the "investigative agency").  It came into the investigative agency's possession when it was seized on December 8, pursuant to a Grand Jury subpoena.

29.     A federal search warrant was obtained for the flash drive and it was examined by the Federal Bureau of Investigation – Computer Analysis Response Team (CART).  The examiners determined a file on the flash drive was encrypted.  CART was able to bypass the encryption to find that the file in question was a digital copy of the letter, Dufrenne wrote to Brenton Tarrant.

30.     The DEVICE was seized under the previously mentioned state search warrant and examined by the St. Charles County Police Department – Cyber Crimes Unit.  The examiner determined the DEVICE was also encrypted, however all methods employed were unsuccessful in bypassing the encryptions.

31.     In conversations with members of the FBI CART unit, it is their belief through training and experience that FBI tools, techniques and experience would enable the successful forensic extraction of the information stored within the DEVICE.  Pursuant to FBI policy, if the FBI were to use its trained forensic tools and examiners the FBI must have a federally issued search warrant to conduct a search and examination.  In other words, pursuant to FBI policy, the previously described state search warrant would be insufficient legal process to enable the FBI to conduct its own search and forensic examination.  Therefore, I seek this federal search warrant in addition to the state issued search warrant to meet FBI policy regarding the search and examination of the DEVICE.

32.     In my training and experience, I know that the DEVICE has been stored in a manner in which its contents are, to the extent material to this investigation, in the same or

substantially the same condition as they were when the DEVICE first came into the possession of the investigative agency.

**DIGITAL STORAGE MEDIUM AND FORENSIC ANALYSIS**

33.     Based on my knowledge, training, and experience, I know that digital storage medium such as flash drives and the DEVICE can store information for long periods of time.

34.     *Forensic evidence.*  As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the DEVICE was used, the purpose of its use, who used it, and when.  There is probable cause to believe that this forensic electronic evidence might be on the DEVICE because:

a.    Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

b.   Forensic evidence on the DEVICE can also indicate who has used or controlled the DEVICE.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c.    A person with appropriate familiarity with how an electronic DEVICE works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how the DEVICE was used, the purpose of their use, who used them, and when.

d.   The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a computer is evidence may depend on other

14

information stored on the computer and the application of knowledge about how a computer behaves.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.   Further, in finding evidence of how the DEVICE was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

35.   *Nature of examination.*   Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the DEVICE consistent with the warrant.  The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the DEVICE to human inspection to determine whether it is evidence described by the warrant.

**CONCLUSION**

36.   I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the DEVICE described in Attachment A to seek the items described in Attachment B.

37.   Because this warrant seeks only permission to examine the DEVICE already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises.  Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

38.   It is respectfully requested that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application, including the application and search warrant.  I believe that sealing this document is necessary because the warrant is

relevant to an ongoing investigation into the criminal organizations as not all of the targets of this investigation will be searched at this time.   Based upon my training and experience, I have learned that, online criminals actively search for criminal affidavits and search warrants via the internet, and disseminate them to other online criminals as they deem appropriate, *i.e.*, post them publicly online through the carding forums.  Premature disclosure of the contents of this affidavit and related documents may have a significant and negative impact on the continuing investigation and may severely jeopardize its effectiveness.

I state under the penalty of perjury that the foregoing is true and correct.

Respectfully submitted,

MARK LEONE
Task Force Officer
FEDERAL BUREAU OF INVESTIGATION

Sworn to, attested to, and affirmed before me via reliable electronic means pursuant to Federal Rules of Criminal Procedure 4.1 and 41 on <u>19th</u> July, 2023.

HONORABLE JOSEPH S. DUEKER
UNITED STATES MAGISTRATE JUDGE

16

**ATTACHMENT A**

The property to be searched is a Dell Personal Computer (PC) (Model: DCNE / Serial: 94FSJ25 [containing a Seagate hard drive; Model: ST500DM002; Serial: Z3TS1DMP] hereinafter described as "the DEVICE" currently in possession of the St. Charles County Police Department – Evidence Division located at 101 Sheriff Dierker Court, O'Fallon, MO 63366.

This warrant authorizes the forensic examination of the DEVICE for the purpose of identifying the electronically stored information described in Attachment B.

**ATTACHMENT B**

1.     All records on the DEVICE described in Attachment A that relate to violations of

18 U.S.C. §249 and involve Christopher Dufrenne from March 15, 2019 to present, including:

    a.   Documents, audio files, video files in any format that reflect any of the following:

        i.   Research regarding the planning and/or execution of hate crimes (as defined in 18 U.S.C. §249);

        ii.   Personal writings regarding the planning and/or execution of hate crimes (as defined in 18 U.S.C. §249);

        iii.   Writings of others regarding the planning and/or execution of hate crimes (as defined in 18 U.S.C. §249);

        iv.   Information about where those in a protected class (as defined in 18 U.S.C. §249) might gather and/or directions to said places;

        v.   Plans to acquire additional weapons and/or ammunition;

        vi.   Correspondence with any other person who has planned and/or executed violence against those in a protected class (as defined in 18 U.S.C. §249);

        vii.   Video games containing violence against those in a protected class (as defined in 18 U.S.C. §249);

        viii.   Data files for video games containing violence against those in a protected class (as defined in 18 U.S.C. §249);

    b.   Any information recording Dufrenne's schedule or travel from March 15, 2019 to the present;

    c.   All bank records, checks, credit card bills, account information, and other financial records.

1

2.      Evidence of user attribution showing who used or owned the DEVICE at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.

2